John A. Coppede (WY Bar No. 5-2485)
Coal Creek Law
1800 Carey Avenue, Suite 700
Cheyenne, WY 82003
Ph: (307) 634-1525
jcoppede@coalcreeklaw.com

Jason D. Evans (*pro hac vice* forthcoming)
Daniel J. Prichard (*pro hac vice* forthcoming)
TROUTMAN PEPPER HAMILTON SANDERS LLP
301 S. College St., 33rd Floor
Charlotte, NC 28202
Ph: (704) 916-1502
Jason.Evans@troutman.com
daniel.Prichard@troutman.com

Christopher R. Jones (*pro hac vice* forthcoming)
Miles H. Kiger (*pro hac vice* forthcoming)
TROUTMAN PEPPER HAMILTON SANDERS LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
Ph: (202) 662-2181; Fx: (202) 274-2994
Chris.Jones@troutman.com
Miles.Kiger@troutman.com

*Counsel for PacifiCorp*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

PACIFICORP, d/b/a Rocky Mountain Power,
an Oregon corporation,

      Plaintiff,

v.

MARY A. THRONE, CHRISTOPHER B.
PETRIE, and MICHAEL M. ROBINSON, in
their official capacities as Commissioners of
the Public Service Commission of Wyoming,

      Defendants.

Civil Action No. _____

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff PacifiCorp, complaining of Commissioners of the Public Service Commission of Wyoming, Defendants Mary A. Throne, Christopher B. Petrie, and Michael M. Robinson, alleges as follows:

## INTRODUCTION

1.      The Public Service Commission of Wyoming (the "Commission") entered a rate order adopting new retail rates for PacifiCorp to be paid by retail customers in the State of Wyoming.  That rate order reduced PacifiCorp's annual revenue requirement by approximately twenty-three million dollars ($23,497,900)[1] as a result of a single adjustment proposed by an intervenor in PacifiCorp's rate case.  That adjustment was based entirely on the Commission's decision to "revalue" the way that federal utility regulators treat electric generating capacity that is held in reserve for system emergencies.  While electric utilities are subject to state and federal regulation, it is well-established that under the Supremacy Clause of the U.S. Constitution federal law in an area of exclusive federal jurisdiction preempts conflicting state law (including as applied by state utility regulatory authorities), even in setting state-jurisdictional retail rates.

2.      In addition, the Commission's order violates the dormant Commerce Clause because it discriminates against interstate commerce in favor of intrastate commerce by reducing Wyoming retail customer rates and leaving PacifiCorp's customers in other states to make up the difference.

---

[1]      The Wyoming Industrial Energy Consumers ("WIEC"), an intervenor in the Commission proceeding that produced the order that is the subject of this Complaint, provided initial testimony in the Commission proceeding that asked for an approximately $29.0 million adjustment but that value was revised at hearing to $23.497 million.

3.     As a result of these violations of federal statutory and constitutional law, PacifiCorp respectfully requests that the Court enter declaratory and injunctive relief as further described below.

## THE PARTIES

4.     PacifiCorp is a corporation organized and existing under the laws of Oregon with its principal place of business at 825 Northeast Multnomah Street, Suite 2000, Portland, OR, 97232.  PacifiCorp's trade name in Wyoming is Rocky Mountain Power.

5.     Defendants Mary A. Throne, Christopher B. Petrie, and Michael M. Robinson are Commissioners (the "Commissioners") of the Commission.  The Commission is an agency of the State of Wyoming.  The Commissioners issued the Memorandum Opinion, Findings and Order ("Order")[2] at issue in this case under color of state law, and the offices they occupy are responsible for its enforcement.  The Commissioners are sued in their official capacities, not as individuals.

## JURISDICTION AND VENUE

6.     This Court has subject-matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. §§ 1331 and 1337, as its claims arise under the Constitution and the laws of the United States, including the Federal Power Act ("FPA") (which preempts contrary state law through the Supremacy Clause), the Commerce Clause, and 42 U.S.C. § 1983.

---

[2] *In the Matter of the Application of Rocky Mountain Power for Authority to Increase its Retail Electric Service Rates by Approximately $140.2 Million Per Year or 21.6 Percent and to Revise The Energy Cost Adjustment Mechanism*, Docket No. 20000-633-ER-23 (Record No. 17252), Mem. Op., Findings & Order (Jan. 2, 2024).

7.     Alternatively, this Court has subject-matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000, PacifiCorp is a citizen of Oregon, and the Commissioners are citizens of the state of Wyoming.

8.     This Court has personal jurisdiction over the Commissioners because they are residents of Wyoming, and their principal place of business is in this District.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Commissioners reside in this District in their official capacities, and a substantial part of the events giving rise to the claims advanced in this action occurred in this District.

10.     PacifiCorp intends to file a petition in the District Court of the First Judicial District County of Laramie, State of Wyoming for appellate review of the Commission's Order, requesting certification of its appeal to the Wyoming Supreme Court.  In its appeal there, PacifiCorp will only pursue claims based on state law.  Further, pursuant to *England v. La. State Bd. Med. Exam'rs*, 375 U.S. 411 (1964), PacifiCorp will expressly reserve its right to bring its federal law claims to this Court.

## FACTUAL BACKGROUND

### PacifiCorp

11.     PacifiCorp is a public electric utility that serves approximately two million customers throughout a six-state service territory, including Wyoming.

12.     As a public utility within the State of Wyoming, PacifiCorp is subject to the Commission's regulatory and supervisory power. *See* WYO. STAT. ANN. § 37-2-112.

13.     PacifiCorp, in addition to selling power to end-users in Wyoming, has two other business functions at the heart of this Complaint.  PacifiCorp transmits electricity in interstate commerce and sells electricity at wholesale in interstate commerce, and it provides transmission service in interstate commerce.  Consequently, PacifiCorp is subject to the jurisdiction of the Federal Energy Regulatory Commission ("FERC").  16 U.S.C. § 824(b).

14.     Further, because PacifiCorp is a public utility that owns, controls, or operates facilities used for transmitting electricity in interstate commerce (i.e., PacifiCorp owns a comprehensive system of high-voltage power lines that make up a significant portion of the interstate grid across its six-state service territory), FERC requires PacifiCorp to provide non-discriminatory access to its power transmission network to third-party users.  16 U.S.C. § 824d. Put another way, PacifiCorp must permit third parties (i.e., wholesale customers other than PacifiCorp and its retail end users) open access to its electric transmission network, including for the transmission and sale of wholesale power.

15.     FERC also requires PacifiCorp to maintain an Open Access Transmission Tariff ("OATT"), which contains the terms and conditions by which PacifiCorp must provide non-discriminatory access to, and service over, its transmission system.  16 U.S.C. § 824d.

**Electric Utilities, the Ratemaking Process, and Dual Federalism**

16.     Electric utilities typically generate, transmit, and distribute electricity.

17.     Electric utilities sell electricity in retail markets (i.e., to end users) and in wholesale power markets (i.e., to others for resale).

18.     Electric utilities operate under significant regulatory oversight from a combination of state and federal authorities.

19.     State public utility commissions, like the Commission here, are generally empowered to regulate rates for retail sales (i.e., sales to the end-user of electricity) and service over "local distribution" facilities, which are generally the street-level low-voltage facilities that deliver power to end users.  These traditional state utility regulatory authorities were preserved under section 201 of the FPA.  16 U.S.C. § 824(b)(1).

20.     On the other hand, the federal government, through FERC, exclusively regulates (1) wholesale sales of electricity (i.e., sales for re-sale) and (2) transmission service over the interstate power grid, generally the higher-voltage grid that moves bulk power from the generation source to the local distribution system, pursuant to section 201 of the FPA.  16 U.S.C. § 824(b)(1).  FERC also regulates the reliability of the grid through a comprehensive scheme of mandatory reliability standards promulgated pursuant to section 215 of the FPA.  16 U.S.C. § 824o.

21.     State public utility commissions generally review a utility's retail rates in a cost of service "rate case."

22.     To set appropriate rates, state public utility commissions must determine a utility's revenue requirement (i.e., the total revenue a utility is authorized to receive annually from retail customers), which reflects the utility's cost of serving its customers.  A utility's revenue requirement is composed of a few basic factors, including the utility's rate base (i.e., the value of the utility's assets less accumulated depreciation), the utility's allowed rate of return on assets

(i.e., its cost of capital, composed of the return on equity and the cost of debt), and the annual expenses the utility incurs (e.g., fuel and labor costs, etc.).  Put simply, state public utility commissions set retail service rates such that utilities can recover the cost of providing electric service and earn a reasonable return on their utility infrastructure investment.

23.     FERC regulates rates for the transmission and wholesale sale of electricity in interstate commerce on both a cost of service and market basis.  FERC uses similar ratemaking tools to ensure that utilities can recover their costs and earn a reasonable return when setting rates for the use of the interstate transmission system.

24.     Most wholesale electric markets rely upon competitive markets to set prices, but some prices are based on the service provider's cost of service.  For wholesale electricity markets, FERC either authorizes jurisdictional entities to sell at market-based rates or at cost-based rates. Rates for interstate transmission service (i.e., the *transportation* service rather than the sale of the electricity), on the other hand, are regulated by FERC largely on a cost-of-service basis.

25.     Because the stability of the power grid always requires that supply and demand be held in perfect balance, FERC requires transmission-owning utilities like PacifiCorp to hold back certain electric generating capacity to respond to real-time changes in demand.  FERC requires transmission *customers* to pay the transmission provider to hold those reserves, and FERC regulates the rates a transmission provider charges for those reserves.  FERC calls these reserves "ancillary services."  A transmission provider charges for these ancillary services under its FERC-regulated OATT.  PacifiCorp prices its ancillary service on a cost-of-service basis pursuant to well-established FERC methodologies.

26.     The FPA divides the jurisdiction over the generation, transmission, and distribution of electric energy between the federal government and the states.  This has been described as a "dual federalist" regulatory approach to the electricity sector under the FPA.

27.     The FPA grants FERC exclusive jurisdiction over "the sale of electric energy at wholesale in interstate commerce" and "the transmission of electric energy in interstate commerce."  16 U.S.C. § 824(b)(1).  Congress also gave FERC authority over the rates, charges, and practices in connection with or affecting rates for the interstate transmission of electric energy and wholesale electric sales.  16 U.S.C. §§ 824d(a), 824e(a).  As such, all rates, charges, and practices in connection with a FERC-jurisdictional service must be just and reasonable, and not unduly discriminatory or preferential.  16 U.S.C. § 824d.

28.     In contrast, the FPA gives states exclusive jurisdiction over retail sales of electricity, "facilities used for the generation of electric energy," and "facilities used in local distribution" of electricity.  16 U.S.C. § 824(b)(1).

29.     While this dual federalist scheme establishes exclusive spheres of federal and state jurisdiction, "[i]t is a fact of economic life that the wholesale and retail markets in electricity, as in every other known product, are not hermetically sealed from each other." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 281 (2016).  "To the contrary, transactions that occur on the wholesale market have natural consequences at the retail level. And so too, of necessity, will FERC's regulation of those wholesale matters." *Id.*

30.     However, actions by one sovereign that directly—even indirectly—intrude on the other's exclusive domain are prohibited. *Id.* at 288–289 (2016) ("The FPA 'leaves no room either

for direct state regulation of the prices of interstate wholesales' or for regulation that 'would indirectly achieve the same result.'") (quoting *N. Nat. Gas Co. v. State Corp. Comm'n Kan.*, 372 U.S. 84, 91 (1963)).  Policies that nominally regulate one aspect of the electricity sector yet "aim[] at" or "target" matters that Congress reserved to the other sovereign are forbidden.  *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 164 (2016) ("States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates, as Maryland has done here.") (citing *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 384–85 (2015)).

**FERC's Regulation of "Reserves" as a Component of Interstate Transmission Service**

31.     PacifiCorp, pursuant to its responsibilities as a FERC-regulated transmission provider offering open access transmission service under its OATT on file with FERC, is required to provide ancillary services (the held-back generation capacity described above) that support the provision of reliable transmission service subject to rates approved by FERC.

32.     Ancillary services are services provided by the transmission provider's own generation resources that are necessary to support the transmission of energy from generating resources to loads while maintaining reliable operation of the transmission system.

33.     In Order No. 888, promulgated in 1996, FERC required transmission providers' OATTs to include six ancillary services as part of providing transmission service to a customer, of which the following are relevant to this Complaint: (a) Regulation and Frequency Response

Service; and (b) Contingency Reserves, made up of Operating Reserve – Spinning Reserve Service and Operating Reserve – Supplemental Reserve Service.[3]

34.     Regulation and Frequency Response Service, denoted Schedule 3 under FERC's *pro forma* OATT, is needed to match generation output with moment-to-moment changes in load by moving generation output up and down via an automatic generation control signal.  Failure to maintain a 60 Hz frequency can result in systemic failure of the electric grid.

35.     Contingency Reserves, made up of Spinning and Supplemental Reserve Service, denoted as Schedules 5 and 6, respectively, under FERC's *pro forma* OATT, are needed to restore load and generation balance when a supply resource trips offline (i.e., unexpectedly is not available).  Operating Reserves are provided by generating units and demand resources that can act quickly, by increasing output or reducing demand, to make up a generation deficiency. Operating Reserve – Spinning Reserve Service is provided by generators or demand resources that are on-line (synchronized to the system frequency) with some spare capacity and capable of increasing their output within a specified period of time, such as ten minutes.  Operating Reserve – Supplemental Reserve Service is provided by generators or demand resources that can be made

---

[3] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

available within a specified amount of time, such as thirty minutes, and are not necessarily synchronized with the system frequency.

36.     Most transmission providers across the West, like PacifiCorp, provide these ancillary services at cost-based rates set by FERC.  These ancillary services rates are specified in PacifiCorp's FERC-jurisdictional OATT.

37.     FERC calculates rates for holding reserves using methodologies based on an average fixed cost that reflect the capacity value of the generating resources used to hold the reserves.

38.     Developing a cost-based rate for each of these three ancillary reserves services first starts with the determination of a reserve requirement, which is comprised of the amount of reserve capacity that must be held by PacifiCorp sufficient to maintain compliance with the relevant mandatory North American Electric Reliability Corporation ("NERC") reliability standards, which constitutes the Electric Reliability Organization overseen by FERC pursuant to FPA section 215.  16 U.S.C. § 824o.

39.     Schedules 3 and 3A of the PacifiCorp OATT reflect the cost of providing Regulation and Frequency Response reserve sufficient to maintain compliance with NERC reliability standard BAL-001-2 and BAL-003-1.1 to PacifiCorp's transmission customers serving load *internal* to the PacifiCorp service territory (Schedule 3), as well as to customers using PacifiCorp's transmission services to *export generation* from the PacifiCorp service territory (Schedule 3A) (the "regulation" reserves).

40.     Schedules 5 and 6 of the PacifiCorp OATT reflect PacifiCorp's cost of providing Contingency Reserve service, both Spinning (Schedule 5) and Supplemental (Schedule 6), which are "contingency" reserves required to be provided by a transmission provider, like PacifiCorp, in order to comply with NERC regional reliability standard BAL-002-WECC-2a.  Because FERC requires PacifiCorp to hold some of its own generation in reserve to provide both these reserves, there are times when PacifiCorp cannot use its own generation to serve its own retail load or to make wholesale sales and must, instead, purchase power from third parties in order to meet the demand of its customers.  PacifiCorp's power purchases from third parties can cost more than generating the same amount of power from its own generation resources.

41.     PacifiCorp's current ancillary services rates, including reserve services rates, were approved by FERC on April 1, 2021, in FERC Docket No. ER21-1015-000.

**The Application**

42.     On March 1, 2023, PacifiCorp applied to the Commission (the "Application"), requesting authority to increase its electric retail rates by approximately $140.2 million per year, which reflects an increase of PacifiCorp's cost of serving its Wyoming retail customers.

43.     Part of PacifiCorp's retail cost of service includes its share of its net power costs ("NPC") (i.e., its energy costs, which is the sum of fuel expenses, wholesale purchase power expenses, and third-party wheeling expenses, less wholesale sales revenue).  All else equal, a higher NPC results in a higher proposed revenue requirement.

44.     To determine its NPC, PacifiCorp uses a production forecasting cost model that simulates the operation of its power system.  The model respects all system operational

constraints, and commits and dispatches PacifiCorp's generating resources, for a cost minimizing forecast in which demand and supply are balanced, and mandatory federal NERC reliability requirements are respected.

45.     PacifiCorp's NPC is calculated on a system-wide basis (i.e., across its six-state service territory), which then gets allocated to PacifiCorp's Wyoming retail customers based on the relative demand PacifiCorp's Wyoming retail customers place on PacifiCorp's total system. PacifiCorp's FERC-imposed responsibilities under Schedules 3, 3A, 5, and 6 provide both costs and benefits to PacifiCorp's Wyoming customers when PacifiCorp calculates rates.

46.     PacifiCorp's Wyoming retail cost of service, including the forecast produced by the NPC model, also reflects PacifiCorp's FERC-mandated contingency and regulating reserves costs in two ways.

47.     First, to account for the federal requirement to hold reserves in actual operations, certain capacity on dispatchable generation is held back in the NPC model, and the model is therefore unable to dispatch that capacity to serve customers or to make wholesale sales to third parties.  As such, PacifiCorp's NPC modeling correctly accounts for FERC-mandated reserves to ensure system reliability consistent with federal grid reliability standards by holding back generation capacity from dispatch in the NPC model.  Accordingly, the incorporation of a reserves limitation into the NPC model produces a cost forecast that is higher than the model would produce if there was no federal reserve requirement, because less generation capacity is available to avoid potentially expensive wholesale power purchases to meet customer demand or to make wholesale sales.  This concept lies at the heart of PacifiCorp's federal preemption claim, as the

Order usurps FERC's exclusive jurisdiction and impinges upon FERC-mandated rates that PacifiCorp must charge its FERC-jurisdictional wholesale customers, as explained in greater detail below.

48.     Second, PacifiCorp credits its Wyoming retail customers for the revenue received from FERC customers via FERC-approved rates for the capacity that is held back on the FERC customer's behalf (the third-party portion of FERC-approved reserves costs hereinafter referred to as "Third-Party Reserves").  In other words, any revenues earned from third-party transmission customers who pay the FERC-approved, cost-based reserve rates specified in PacifiCorp's OATT for using the PacifiCorp transmission system are credited back to PacifiCorp's Wyoming retail customers as a deduction to PacifiCorp's retail cost of service.  Effectively, this means that FERC customers pay for a portion of PacifiCorp's generating capacity, and the PacifiCorp then sets aside that portion of generating capacity to serve FERC customers.  These third-party revenue credits ensure that PacifiCorp's Wyoming retail customers do not subsidize third-party users of the PacifiCorp transmission system.  In this case, PacifiCorp included $12 million in FERC-jurisdictional OATT revenue received under Schedules 3, 3A, 5, and 6 as an offset to retail rates to reflect the contribution to capital costs that FERC customers made.

**Wyoming Industrial Energy Consumers' Unfounded Adjustment to PacifiCorp's NPC Adopted by the Commission**

49.     When seeking permission to change retail rates in a rate case due to increases in their cost of service, utilities provide testimony in support of their applications.  Interested third parties may intervene and provide testimony as well.

50.     During the retail rate case at issue here, an association of industrial electric consumers called the Wyoming Industrial Energy Consumers ("WIEC") developed a novel ratemaking theory that, to PacifiCorp's knowledge, a state commission has never before adopted (indeed, WIEC offered no precedents for this adjustment). WIEC conceded, as they must that, "[s]ince the reserved capacity cannot be used to serve native retail customers or sold into the market for the benefit of native retail customers, regulating reserves held for non-native customers result in material costs to [PacifiCorp]." That cost comes in the form of the cost of replacement power bought at market. But the WIEC adjustment changes the NPC model by removing the reserves obligation entirely, and instead claims to "revalue" the Third-Party Reserves in the NPC model. WIEC's single largest NPC adjustment (approximately $23.4 million on a Wyoming-allocated basis) proposes to re-price the FERC-approved rates associated with Third-Party Reserves for purposes of setting Wyoming retail rates.

51.     In WIEC's view, this opportunity cost "shortfall" should be considered a subsidy provided to third-party customers from PacifiCorp's Wyoming retail customers. To eliminate this hypothetical "subsidy" and reverse this supposed revenue "shortfall," WIEC's adjustment assumes that the NERC- and FERC-required portion of generating capacity associated with reserves that PacifiCorp must hold for third-party users of the transmission system should instead be available for energy supply, along with the rest of the PacifiCorp's generation fleet. This is in fact directly contrary to FERC's mandate that these resources must *not* be available for energy supply, but instead, must be held in reserve.

52.    To calculate its adjustment, WIEC simply removed the FERC-mandated reserve requirements from the NPC model so that generating resources held back to provide reserves (as required by FERC/NERC) were assumed available to be dispatched to serve retail customers or to generate additional off-system sales revenue.  WIEC then compared the energy value of the freed-up capacity to the OATT revenues realized from selling ancillary services and decreased the NPC forecast to reflect the additional revenue that could be earned if PacifiCorp were not required to hold reserves.

53.    In essence, WIEC established a fiction that ignored an entire federal system. WIEC assumed more PacifiCorp generation capacity is available in forecasting power system costs than PacifiCorp's FERC-approved reserves rates, and NERC reliability standards, actually provide.  Accordingly, WIEC's adjusted NPC forecast is calculated with insufficient reserves, which deviates from actual operations and would result in reliability violations if implemented in the real world.

54.    WIEC compared its novel adjusted NPC result with PacifiCorp's forecast.  The net effect of this was a reduction of $211 million in NPC on a total-company basis, with approximately $29 million allocated to PacifiCorp's retail customers in Wyoming.  WIEC modified its Wyoming-allocated $29 million adjustment to approximately $23.5 million at the public evidentiary hearing.  The Commission, without explanation, ordered a $29 million downward adjustment based on WIEC's novel argument.  Thus, the roughly $23.5 million downward adjustment was the financial impact to PacifiCorp from the WIEC adjustment alone.

**The Order**

55.     On January 2, 2024, the Commission issued the Order, approving a rate increase for PacifiCorp of approximately $53.9 million.   The Order was signed by each of the Commissioners.

56.     In the Order, the Commission adopted WIEC's proposed adjustment to PacifiCorp's NPC:

> The Commission concludes an adjustment to the third-party reserve costs is appropriate. The Commission finds the testimony of WIEC witness Bradley G. Mullins credible and persuasive. Mr. Mullins argues an adjustment is needed to revalue third-party reserves in NPC in the same manner that FERC values them. He states this ensures Wyoming [Commission]-jurisdictional customers do not subsidize FERC-jurisdictional customers. That adjustment, as outlined in WIEC's post-hearing brief, appropriately apportions the costs between FERC jurisdictional customers and Wyoming ratepayers. Accordingly, the Commission adopts his adjustment.[4]

57.     The Commission also appears to have only identified PacifiCorp's Wyoming-allocated NPC by $29 million, which was greater than the approximately $23.5 million adjustment proposed by WIEC at the hearing.

58.     The above-referenced NPC adjustment resulted in an equivalent decrease to PacifiCorp's revenue requirement.   As a result, the Order will improperly cause PacifiCorp to lose at least $23.5 million in revenue to cover the costs that PacifiCorp will incur to serve Wyoming customers.   The Order disregards FERC's exclusive jurisdiction to establish (1) the rates for contingency and regulating reserves, and (2) the revenue that PacifiCorp collects,

---

[4] Order at ¶ 215.

because pursuant to its responsibilities as a FERC-regulated transmission provider offering open access transmission service under its OATT on file with FERC, PacifiCorp is required to provide contingency and regulating reserves (including to third parties) that support the provision of transmission service and comply with mandatory NERC reliability requirements.

59.     On February 6, 2024, PacifiCorp filed an application for rehearing, requesting reconsideration of three issues decided in the Order.

60.     The first of those three issues related to the Commission's decision with respect to WIEC's proposed NPC adjustment.

61.     On April 19, 2024, the Commission denied PacifiCorp's application for rehearing.

**FIRST CLAIM FOR RELIEF**
**PREEMPTION**

62.     The allegations contained in the preceding paragraphs of the Complaint are incorporated by reference as if set forth fully herein.

63.     The Commission's Order, which adopted the WIEC adjustment, is preempted under the Supremacy Clause of the U.S. Constitution because it casts aside a scheme of federal regulation to serve its own purposes.  WIEC simply did not like the financial impact of FERC-mandated reserve requirements on retail rates.  WIEC was clear about that on the record: "Wyoming customer rates are being increased as a result of these [federal ancillary] services, which means that Wyoming ratepayers are subsidizing those third-party customers."  While WIEC was free to argue for an adjustment that disregards federal reserve requirements and ratemaking, the Commission was not free to adopt it.

64.     The WIEC adjustment relies entirely on a foundation of dislike and disregard for federal reserve requirements, by pretending for power cost modeling purposes that those requirements did not exist.  WIEC imputed to PacifiCorp fictional power generation and sales that it could not possibly make while complying with federal regulations, which were promulgated pursuant to FERC's exclusive jurisdiction.

65.     Presumably well aware of its incursion into a well-established federal area, WIEC claimed to honor FERC's requirements by asserting it was simply "revaluing" reserves "in the same manner" as FERC.  WIEC did no such thing; all it really did was model NPC at a fictionally low level of production costs by imputing sales to PacifiCorp federal law would prohibit.

66.     In short, WIEC convinced the Commission that the federal reserve requirement is just a bad deal because the company earns only cost-based rates for holding those reserves, when that generating capacity would have been far more valuable being sold into the market or being used to offset expensive purchases.  Good deal or bad, the Commission clearly may not supplant an exclusively federal regulatory scheme in this manner.

67.     This premise disregards FERC's exclusive jurisdiction to establish (1) the rates for contingency and regulating reserves, and (2) the revenue that PacifiCorp collects.   For these reasons, the Commission's Order is preempted.

68.     Congress has the power to preempt state law.  Preemption may be express, or, in the absence of an express provision, state law may be preempted where Congress intends that a law "occupy the field" (i.e., where a pervasive scheme of federal regulation implicitly precludes

supplementary state regulation) or where state law conflicts with federal law. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

69.     The FPA gives FERC exclusive jurisdiction to regulate the "transmission of electric energy in interstate commerce" and the "sale of electric energy at wholesale in interstate commerce . . . ."  16 U.S.C. § 824(b).  Congress also gave FERC authority over rates, charges, and practices in connection with or affecting those wholesale rates.  16 U.S.C. §§ 824d(a), 824e(a).

70.     In contrast, the FPA gives states exclusive jurisdiction over retail sales of electricity, "facilities used for the generation of electric energy," and "facilities used in local distribution" of electricity.  16 U.S.C. § 824(b)(1).

71.     In exercising its jurisdiction, FERC is required to ensure that interstate transmission and wholesale power rates are "just and reasonable."  16 U.S.C. § 824d.

72.     Pursuant to its authority to determine the reasonableness of interstate transmission and wholesale power rates, "*interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates*."  *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 962 (1986) (emphasis added).

73.     Thus, "[t]he FPA and the Supremacy Clause . . . preempt any state action modifying or overruling a filed rate."  *AEP Tex. N. Co. v. Tex. Indus. Energy Consumers*, 473 F.3d 581, 584 (5th Cir. 2006), *cert. denied sub nom., Hudson v. AEP Tex. N. Co.*, 552 U.S. 812 (2007) (citation omitted)*.*  This rule is referred to as the "filed rate" doctrine.  *Nantahala Power*, 476 U.S. at 964.  Accordingly, state actions that directly—or even indirectly—intrude on FERC's

exclusive domain are prohibited. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 281 (2016) (The "FPA 'leaves no room either for direct state regulation of the prices of interstate wholesales' or for regulation that 'would indirectly achieve the same result.'") (quoting *N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 91 (1963)).

74. Thus, state orders that nominally regulate one aspect of the electricity sector yet "aim[] at" or "target" matters that Congress reserved to FERC are forbidden. *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 164 (2016) ("States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates, as Maryland has done here.") (citing *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015)).

75. Therefore, because federal tariffs like PacifiCorp's OATT are approved by FERC, those tariffs preempt contrary state orders. *See Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 47 (2003) (rates on file with FERC "must be given binding effect by state utility commissions" because "[w]hen the filed rate doctrine applies to state regulators, it does so as a matter of federal pre-emption through the Supremacy Clause" (internal quotation marks omitted)).

76. Federal courts have consistently recognized that state actions are "conflict" preempted when they make it impossible for regulated entities to comply with both federal and state requirements simultaneously. Under the FPA, this type of preemption generally arises when a state exercises its reserved authority over retail rates to effectively overrule a prior FERC determination that a rate or practice is just and reasonable. *See, e.g., Nantahala Power*, 476 U.S.

953; *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988); *Entergy La., Inc.*, 539 U.S. 39; *Hughes*, 578 U.S. 150.

77.     PacifiCorp transmits electric energy in interstate commerce, and pursuant to its responsibilities as a FERC-regulated transmission provider offering open access transmission service under its OATT on file with FERC, is required to provide contingency and regulating reserves (including to third parties) that support the provision of transmission service and comply with mandatory NERC reliability requirements.   PacifiCorp must provide contingency and regulating reserves at cost-based rates that are expressly stated in its OATT (the portion of contingency and regulating reserves that PacifiCorp must provide to third parties are the Third-Party Reserves).

78.     In the Commission's Order adopting the WIEC Third-Party Reserves adjustment, it provided the following:

> The Commission concludes an adjustment to the third-party reserve costs is appropriate. The Commission finds the testimony of WIEC witness Bradley G. Mullins credible and persuasive. Mr. Mullins argues an adjustment is needed to revalue third-party reserves in NPC in the same manner that FERC values them. He states this ensures Wyoming [Commission]-jurisdictional customers do not subsidize FERC-jurisdictional customers. That adjustment, as outlined in WIEC's post-hearing brief, appropriately apportions the costs between FERC jurisdictional customers and Wyoming ratepayers. Accordingly, the Commission adopts his adjustment.[5]

79.     Contrary to the Commission's Order, however, WIEC's adjustment does not revalue Third-Party Reserves in NPC model "in the same manner that FERC values them"

---

[5] Order at ¶ 215.

because FERC calculates rates for holding reserves using methodologies based on an average

fixed cost that reflects the *capacity* value of the generating resources whereas WIEC's adjustment

pertains to the PacifiCorp's NPC model, thus reflecting an *energy* value of the resources.

Capacity costs are not included in the NPC forecast and therefore FERC does not "value" Third-

Party Reserves based on the NPC impact of holding reserves.  Thus, WIEC's adjustment actually

revalues Third-Party Reserves on a different basis than how FERC values them, thus directly

conflicting with PacifiCorp's FERC-approved, cost-based methodologies for determining

reserves rates.

80.     Contrary to FERC, WIEC's adjustment adopted by the Commission "values"

Third-Party Reserves based on the *energy* value of the resources used to hold reserves.  WIEC

calculated its adjustment by adding in the generating capacity associated with holding Third-Party

Reserves to the NPC model.[6]  This allowed the resources that are required by FERC to be held in

reserve to instead be dispatched by the NPC model to serve customers or generate revenue

through off-system sales.[7]  WIEC quantified the difference between the NPC model with and

without the Third-Party Reserves as $175 million, which explicitly represents the *energy* value

that the resources holding reserves could provide as a reduction to NPC if the resources were not

---

[6] In the Commission proceeding that produced the Order that is the subject of this Complaint, the relevant record citation to the explanation of the WIEC adjustment was to "Direct Testimony of Bradley G. Mullins at 66 (WIEC Exhibit 202)."

[7] *Id.*

holding reserves.[8]  WIEC's adjustment then replaces this $175 million NPC *energy* value with a $12 million non-NPC *capacity* value, resulting in a net decrease to NPC of $163 million.[9]

81.    FERC's use of a capacity value to derive rates for reserves that are actually charged and the Commission's use of an energy value to impute a different reserves rate altogether are fundamentally incompatible, and one cannot be substituted for the other.  FERC calculates the cost of reserves as the capital costs of the resources holding reserves, while WIEC calculated the cost of reserves as the lost revenue that would have been earned if reserves were not held.  Therefore, rather than valuing Third-Party Reserves "in the same manner" as FERC, WIEC's adjustment explicitly values Third-Party Reserves using an entirely different methodology than FERC.  Simply replacing one dollar figure with another does not reconcile the different methodology employed by WIEC when calculating its adjustment.  By limiting recovery to only the capacity value of the resources holding reserves, while crediting customers for the energy value, the Commission has created an entirely new methodology for calculating the value of reserves and that methodology is directly contrary to federal law and FERC precedent.

82.    The Commission's Order also reapportioned Third-Party Reserves based on the conclusion that FERC customers should be paying more for reserves held on their behalf to eliminate the "subsidy" the Commission claims would otherwise be paid by Wyoming

---

[8] *Id.*

[9] *Id.*

customers.[10]  Indeed, the Commission reapportioned what the Commission decided are the costs of Third-Party Reserves, to allocate a greater portion to FERC-jurisdictional wholesale customers than PacifiCorp is allowed to recover from those customers under FERC's rates (based on the *capacity* value of the reserved capacity).

83.     Rather than paying the capacity value of resources holding reserves, as FERC's rates require, the Commission instead found that PacifiCorp's FERC customers should be paying the higher energy value of resources holding reserves and reapportioned $163 million by removing it from Wyoming rates.  WIEC's testimony on this point was clear—if PacifiCorp wants to recover the value of the reserves that are to be removed from the NPC forecast by its adjustment, then it must do so from FERC-jurisdictional customers.[11]  This approach overlooks the fact that PacifiCorp has no legal basis for demanding compensation from its FERC-jurisdictional customers any higher than the FERC-approved, capacity-based rate.

84.     The Commission's Order thus assumes that PacifiCorp should include generating capacity associated with holding Third-Party Reserves in the NPC model contrary to what is allowed under its FERC-approved reserve rates and NERC reliability standards.  In so assuming,

---

[10] Order at ¶ 215.

[11] In the Commission proceeding that produced the Order that is the subject of this Complaint, the relevant record citation to this testimony was "Direct Testimony of Bradley G. Mullins at 65 (WIEC Exhibit 202)," which further provided ("the costs of serving non-native loads and resources should be paid for by those loads and resources" and therefore "[i]f [PacifiCorp's] FERC-approved OATT rates are inadequate to recover its cost of serving non-native customers, it would be most appropriate for [PacifiCorp] to seek to recover the funds through its FERC rates, not through an increase to Wyoming customers' rates.").

the Commission's decision imputes more Third-Party Reserves revenues to PacifiCorp than it actually receives from FERC-approved reserves rates.  The Commission's decision does this even though PacifiCorp unquestionably is not entitled to include more generating capacity associated with Third-Party Reserves to use in the NPC model than the FERC-determined allocation.  The net ratemaking effect of the Commission's decision is for PacifiCorp to pretend that it is paying less for its NPC, because the Commission's adjustment assumes more of its Third-Party Reserves capacity is available to include in the NPC model than it can under its FERC-approved reserve rates.  However, the fact that the Commission sets retail rates does not give it license to ignore the limitations that FERC has placed upon PacifiCorp's available sources of generating capacity used for supplying power as a result of the requirement to providence ancillary services reserves at FERC-approved rates.

85.     The Commission's adjustment uses its own novel methodology for calculating what the Commission believes FERC rates should be to eliminate the "subsidy" and then reduces Wyoming retail rates as if PacifiCorp were recovering more through its FERC rates than has been authorized by FERC.  The Commission is explicitly second-guessing the FERC rates by concluding that it must reapportion costs to prevent Wyoming subsidization of FERC customers.  This reapportionment is conceptually the same as the impermissible reapportionment the U.S. Supreme Court struck down in *Nantahala*, *Mississippi Power and Light*, and *Hughes*, and therefore the Commission's adjustment is preempted by federal law.

86.     The Commissioners' infractions are ongoing.  As relief, PacifiCorp seeks the declaratory and injunctive relief described below.

**SECOND CLAIM FOR RELIEF**
**COMMERCE CLAUSE**

87.     The allegations contained in the preceding paragraphs of the Complaint are incorporated by reference as if set forth fully herein.

88.     A state violates the dormant Commerce Clause if it "clearly discriminates against interstate commerce in favor of intrastate commerce." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (quoting *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004)) (internal quotation marks omitted).

89.     As used in a Commerce Clause analysis, "discrimination" simply means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994).

90.     The unconstitutional protectionism that violates the Commerce Clause is evident in the record in two primary respects.  First, the entire purpose of the WIEC adjustment was to un-do what WIEC perceived as a subsidy by Wyoming customers of out-of-state customers taking transmission service across PacifiCorp's six-state footprint under the FERC-approved OATT. Indeed, WIEC asserted that it "is unreasonable to require ratepayers in Wyoming to subsidize the cost of serving non-native loads and resources" and that if PacifiCorp's "FERC-approved OATT rates are inadequate to recover its costs of serving non-native customers, it would be most appropriate for [PacifiCorp] to seek to recover the funds through its FERC rates, not through an

increase to Wyoming customers' rates."[12]   Taking WIEC's theory at face value that the FERC requirement to hold back reserves effectuates such an interstate subsidy, Wyoming has no authority to undo it to further its protectionist desires.  Nonetheless, in its Order adopting WIEC's proposed adjustment, the Commission explicitly relied on WIEC's assertion that its adjustment to the "third-party reserves in NPC . . . ensure[s] [Commission]-jurisdictional customers do not subsidize FERC-jurisdictional customers."

91.     Second, the WIEC adjustment created a revenue shortfall that WIEC itself testified could only be filled by raising rates on *out of state* FERC customers.  Wyoming has no ability to purposely cause an increase on out of state FERC-jurisdictional customers by creating a revenue shortfall that can only be filled by those out of state parties, nor can it do so to the benefit of Wyoming retail customers (by purposely causing a decrease in the rates paid by those customers). The Commission thus violated the Commerce Clause by engaging in clear economic protectionism, and by seeking to burden out of state parties by creating and exporting a revenue shortfall.

92.     The Commission's explicit attempt at local protectionism is plainly inconsistent with the dormant Commerce Clause.  The Commissioners' infractions are ongoing.  As relief, PacifiCorp seeks the declaratory and injunctive relief described below.

---

[12] In the Commission proceeding that produced the Order that is the subject of this Complaint, the relevant record citation to this quotation was "Direct Testimony of Bradley G. Mullins at 65 (WIEC Exhibit 202)."

**THIRD CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

93.     The allegations contained in the preceding paragraphs of the Complaint are incorporated by reference as if set forth fully herein.

94.     Because the Commissioners are liable to PacifiCorp as alleged above under 42 U.S.C. § 1983, PacifiCorp seeks a declaratory judgment from this Court that the Commission's approval of the WIEC adjustment is preempted by the Federal Power Act under the Supremacy Clause of the U.S. Constitution.  That is because, by operation of the Supremacy Clause, the FPA preempts any state action that interferes with, or is contrary to FERC's exclusive jurisdiction to set the rates, terms and conditions for ancillary services as a component of interstate transmission service.  The Commissioners also violated the Commerce Clause of the U.S. Constitution by endorsing a protectionist effort to undo what WIEC argued was a subsidy by Wyoming retail customers of out-of-state OATT customers.

95.     PacifiCorp is entitled to a declaration and injunction ordering the Commissioners to reverse their decision requiring PacifiCorp to improperly lower its revenue requirement in association with WIEC's Third-Party Reserves adjustment.

96.     An actual and substantial controversy exists between PacifiCorp and the Commissioners, having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  The Commission's adoption of a rate adjustment based entirely out of dissatisfaction with the federal scheme resulted in inappropriately low rates for PacifiCorp.  PacifiCorp further contends that because the FPA and the Supremacy Clause preempt

any state action modifying or overruling a filed rate, the Order (which requires PacifiCorp to violate the above requirements) is preempted.  The Commissioners dispute this contention.

97.     PacifiCorp has no adequate remedy at law, and it will be irreparably harmed by the Order and the Commissioners' enforcement of the Order.  PacifiCorp therefore requests a declaration of its rights as to such matters, as well as to further necessary or proper relief, including injunctive relief, pursuant to 28 U.S.C. § 2202.  PacifiCorp is entitled to attorneys' fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, PacifiCorp respectfully requests:

A.     A declaration that: the Commission exceeded its legal authority under the Constitution by issuing its Order; the Commission's actions as applied in the Order are preempted by the FPA and violate the dormant Commerce Clause; and the Order is unenforceable in these respects;

B.     A permanent injunction: (a) requiring the Commissioners to comply with this Court's declaration as sought above; and (b) compelling the Commissioners to reinstate the amount of the annual revenue requirement associated with the WIEC adjustment and enter any such orders necessary to make PacifiCorp whole from the Commission's unlawful actions;

C.     Attorney's fees and recoverable costs of suit and other expenses; and

D.     Such further relief as the Court may deem just and proper.

Respectfully submitted this 16th day of May 2024.

                                          */s/ John A. Coppede*

John A. Coppede (WY Bar No. 5-2485)
Coal Creek Law
1800 Carey Avenue, Suite 700
Cheyenne, WY 82003
(307) 634-1525
jcoppede@coalcreeklaw.com

Jason D. Evans (*pro hac vice* forthcoming)
Daniel J. Prichard (*pro hac vice* forthcoming)
TROUTMAN PEPPER HAMILTON SANDERS LLP
301 S. College St., 33rd Floor
Charlotte, NC 28202
(704) 916-1502
Jason.Evans@troutman.com
Daniel.Prichard@troutman.com

Christopher R. Jones (*pro hac vice* forthcoming)
Miles H. Kiger (*pro hac vice* forthcoming)
TROUTMAN PEPPER HAMILTON SANDERS LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 274-2886
(202) 274-2994 (facsimile)
Chris.Jones@troutman.com
Miles.Kiger@troutman.com

*Counsel for PacifiCorp*